Argued and submitted September 22, reversed December 17, 1997

In the Matter of
Precious Murranda Ann Armijo,
a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Sybil Renee ARMIJO,
aka Sybil Renee Brayley,
*Appellant.*

(95-391J-02; CA A97399)

950 P2d 357

Theresa M. Kohlhoff argued the cause and filed the brief for appellant.

Sharon R. Schooley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Haselton and Armstrong, Judges.

HASELTON, J.

**HASELTON, J.**

Sybil Armijo Brayley (mother) appeals from a judgment terminating her parental rights to her two-year-old daughter. ORS 419B.500. On *de novo* review, ORS 419A.200(5); ORS 19.125(3), we conclude that the State Office for Services to Children and Families (SOSCF) failed to prove, by clear and convincing evidence, that child's reintegration into mother's home is "improbable in the foreseeable future due to conduct or conditions not likely to change," ORS 419B.504, or that mother "failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of [the] petition." ORS 419B.506. Accordingly, we reverse.

At the time of the termination hearing in March 1997, mother was 25 years old. Mother had a difficult and unstable adolescence. When she was 10, she ran away from home for the first time and, thereafter, shuttled between foster homes and the streets. Starting when she was 12, mother regularly abused drugs and alcohol.

In 1986, when she was 15, mother met, and became pregnant by, Mark Keppler. They had three children and separated in 1992, with Keppler gaining custody of the children. Although mother continued to engage in heavy substance abuse, there is no credible evidence that, during her relationship with Keppler, mother abused or neglected her children.[1]

In the summer of 1994, mother began an intimate relationship with Bruce Brayley, child's father, to whom mother was married at the time of the termination hearing. Child was conceived shortly after mother and Brayley met. Mother and Brayley regularly used drugs, including methamphetamine and, occasionally, heroin. In early January 1995, mother, suspecting that she was pregnant, saw a physician, who confirmed the pregnancy. Although the evidence

---

[1] One witness testified, parenthetically and anecdotally, that, on one occasion, mother took one of the children on a family camping trip while the child had an ear infection. Between December 1992 and March 1997, mother saw the children from her first marriage only once.

is somewhat confused and conflicting, it appears that mother continued to use drugs for a short period after she strongly suspected—or even knew—that she was pregnant but before the pregnancy was medically confirmed. She subsequently abstained from substance abuse until after child's birth.

Child was born on March 29, 1995. She was relatively healthy, and there is no indication in the record that she was drug-affected or suffered from fetal alcohol syndrome.

Shortly after child's birth, mother became extremely depressed and resumed using methamphetamine, which exacerbated her depression. At the same time, mother and Brayley faced eviction, and their relationship deteriorated. In the first two weeks of May 1995, mother attempted suicide three times. Although the sequence is not entirely clear, it appears that, in the first instance, mother stabbed or cut herself with a knife; in the second, she took an overdose of antidepressant pills; and in the third, she attempted to strangle herself with a hair dryer cord. Child was in mother's care at the time of the first suicide attempt but not the last two.

Following the first attempt, mother saw child's pediatrician, who contacted SOSCF on May 8, 1995. On May 9, SOSCF personnel spoke with mother, who voluntarily agreed to place child with two collateral relatives, Juanita Beaty and her daughter, Daylene Hovey.[2] The last two suicide attempts, on May 12 and May 15, followed that voluntary placement and, according to mother, occurred, in part, "because I didn't have my daughter—you know, everything was hopeless." After one of the suicide attempts, Hovey asked mother to think about what would happen to child if mother killed herself, and mother replied, "The next time, I'll take her with me."

Beginning in May 1995, SOSCF attempted, through its "Shelter Team,"[3] to help mother deal with her substance

---

[2] Mother testified that she placed child with Beaty and Hovey because:

"It was somebody that I knew and because I was at—I needed—I was attempting suicide and it's—I was in depression. I was using drugs. I was not the correct place for my daughter to be at that time."

[3] At the termination hearing, a witness described the Shelter Team:

abuse and mental health problems. Throughout the summer and into the fall of 1995, mother did not cooperate in, and, indeed, generally resisted, those efforts. She consistently denied having substance abuse or mental health problems, continued her drug use, failed to keep appointments for counseling and other services, and relapsed while attending a treatment program.

In August 1995, SOSCF referred mother to Dr. James Ewell, a psychologist, for evaluation. Ewell noted that mother admitted to recent cocaine and marijuana use and remarked that there was a "distinct possibility" that mother's performance and responses during the interview were influenced by drug use. He further remarked that characteristics of a histrionic personality disorder with borderline features were "readily apparent."

Based on his interview with mother and results of psychological testing, Ewell rendered a diagnosis of polysubstance abuse and histrionic personality disorder[4] with borderline features.[5] Ewell concluded:

---

"It was federally funded to provide an interdisciplinary approach to dealing with families with multi-level issues and multi-level capacity, particularly working with clients that had drug addiction issues and dual diagnosis problems.

"* * * * *

"Shelter Team had the capacity * * * to offer * * * services related to drug and alcohol addiction, services related to mental health issues, services related to child care, parenting, respite, housing, and transportation."

[4] Ewell described histrionic personality disorder as being "characterized by a pervasive pattern of excessive emotionality and attention-seeking":

"These individuals often engage in inappropriate, sexually seductive or provocative behaviors. They display rapidly shifting and shallow expressions of emotion. They consistently use physical appearance to draw attention to themselves. They have a style of speech which is excessively impressionistic and lacking detail. They show self-dramatization, theatricality and exaggerated affect."

[5] Ewell described borderline personality disorder as being "characterized by a pervasive pattern of instability within interpersonal relationships and affect":

"These individuals engage in frantic efforts to avoid real or imagined abandonment. They demonstrate a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation. They are impulsive in areas that are potentially self-damaging (for example sexual behaviors, substance abuse). Recurrent suicidal behaviors, gestures or threats are common. Affective instability is also frequently observed."

"[Mother's] current mental/emotional condition is one of severe maladjustment. Her multiple diagnoses exacerbate the level of pathology. At this time, she certainly would not be able to put the needs of her infant daughter before her own. Her psychological profile, coupled with her history of substance abuse suggest she would present a significant level of risk to her daughter. Even if she did not intentionally try to harm [child], [mother's] judgment is severely impaired. She would most likely continue making decisions which would place herself and her dependent baby in extremely dangerous situations.

"Without intensive, residential and long-term treatment, [mother] could not be expected to adequately care for her child within the foreseeable future. She first will need to receive long-term residential chemical dependency treatment. After that program is successfully completed, she will of course need to engage in a variety of after-care resources. Given the intensity of her dependencies, a residential stay of at least six months would most likely be necessary.

"In addition to the chemical dependence treatment [mother] will require individual psychotherapy for her personality disorders. Although that treatment could be received on an outpatient basis, it will need to extend over a period of most likely several years. * * *

"At the time of this evaluation, [mother] was minimizing her need for any form of treatment. She was willing to receive some forms of counseling, but demonstrated virtually no insight toward her true level of psycho/behavioral maladjustment. As a result of this attitude and the severity of [mother's] condition, the prognosis for significant change in the future is poor. It must be emphasized that her condition will not spontaneously improve without treatment. If she fails to follow through and receive the appropriate level of care, it may be necessary to seek the permanent placement of her child within an adoptive setting."

Following Ewell's assessment, and throughout the fall of 1995, the Shelter Team attempted to place mother with The Crossroads, a program that specializes in treating "dual diagnoses" patients, *i.e.*, people who both are chemically dependent and have personality disorders. However, those efforts were unavailing, both because The Crossroads

had no available space and because mother failed to maintain sobriety, a requirement for admission to The Crossroads' residential treatment program. As late as December 1995, while mother was waiting for space to open at The Crossroads, she told an SOSCF caseworker that she had been using methamphetamine every other day.

In January 1996, mother continued her drug use and missed at least two appointments with SOSCF and treatment personnel. On January 6, 1996, Brayley, whom mother had married in August 1995, left for California to participate in a "Teen Challenge" program in the San Francisco Bay area.[6] Shortly thereafter, mother was evicted from her apartment. On January 26, shortly after mother had again tested positive for drug use and after she had missed an appointment with her caseworker, the Shelter Team closed her file. On February 21, 1996, SOSCF decided to seek termination of mother's parental rights and discontinued any assistance addressing mother's substance abuse and mental health issues. SOSCF filed the petition to terminate on May 13, 1996.

From February through April 1996, mother was homeless and continued using drugs. However, in early May, mother, on her own, decided to try to change her life. She called The Crossroads and pleaded to be admitted:

> "I * * * told them that I really needed help, that my life was out of control. My drug problem was very bad, and I knew that my life wasn't—you know, it was just out of control. I was going to lose my daughter, and I really needed help. And I asked them to please, please, let me in. And they— that I was willing to change my life, that I wanted a new life."

Staff at The Crossroads told mother that they would admit her if she first "dried out" at Buckley House, a short-term detoxification center.

On May 5 or 6, mother voluntarily entered Buckley House, remained for three days—"the first real positive step that I had [taken] towards my drug addiction"—and then

---

[6] The nature and structure of the Teen Challenge program is described below. 151 Or App at 674-75.

directly entered The Crossroads. From the time mother entered Buckley House in May 1996 through the termination hearing in March 1997—a period of 10 months—mother remained sober, apparently without a single relapse.

On May 9, 1996, mother entered The Crossroads, where she successfully completed an intensive six-week course of residential treatment and training, which focused on causes of substance abuse, modifications of life patterns, development of support networks, and identification of relapse symptoms and relapse strategies. Upon mother's discharge from The Crossroads, the staff therapist concluded:

> "The goal of this client was to stabilize and educate for further long term [treatment]. Significant progress was made with behavioral modification and medication. Client has progressed from continual disruptions to 1 week with no incidents.
>
> "* * * * *
>
> "This client requires a firm team approach to minimize triangulating and manipulating. She uses out of control anger to defocus and disrupt. Medication, time outs and limited attention to this behavior enabled client to abstain or control her outbursts on a consistent basis. * * * Client appears to be motivated for sobriety but needs long term, intense counseling to make this a possibility. * * * She has a strong spiritual program."[7]

The therapist recommended that mother continue further intensive residential treatment and specifically referred to the Teen Challenge program.

Shortly after completing The Crossroads program, mother left Oregon to enter a Teen Challenge program in California. Although the record is not entirely clear, it appears that from January until leaving for California in July 1996, mother attended scheduled visitations with child approximately twice a month.[8]

---

[7] Mother testified that, as a result of her participation at The Crossroads, she had learned that, because of the "muck" and "stuff" in her life, she had "just not [been] willing to take their hand when they put their hand out; and that [her] daughter had suffered for all of the time that it took [her] to come to the realization that [she] needed help."

[8] An SOSCF caseworker twice brought child to see mother while she was at The Crossroads.

In deciding to leave for California, mother was "afraid that [SOSCF] might think I might abandon my daughter." Nevertheless:

> "I knew that I had to take care of me before I could take care of my daughter. I knew that if I risked me relapsing, that I would never get [her]. But if I was to, you know, take my chance and go to California, that I could be clean and have a life for my daughter. * * *
>
> "* * * * *
>
> "My intent was to get clean—was to get clean and be able to be a productive person in society and to become the mother that [SOSCF] wanted me to be."

On June 30, 1996, mother entered Teen Challenge's Alum Rock Center for Women and Children in San Jose. At that time, Brayley was participating in Teen Challenge's Feather River Center in Live Oak, California. In September, both mother and Brayley entered Teen Challenge's Asbury Family Center for married couples in San Jose.

Teen Challenge, a Christian faith-based program devoted to addressing "life-controlling" problems, operates 120 facilities throughout the United States.[9] Although the program originally served only adolescents, it now also serves persons in their twenties and thirties. The program is based on principles and daily practice of "Christian discipleship" and not, except coincidentally, on a "medical treatment/disease" model of addiction[10] incorporating 12-step methodology. Teen Challenge combines elements of education, prayer, church attendance, informal counseling, close residential supervision, and, when appropriate, interpersonal intervention. The premise of Teen Challenge's training and counseling sessions is the belief that "the answers are within God for any kind of problem."[11] After the participants complete the one-year residential program, Teen Challenge

---

[9] In 1996, Teen Challenge operated two facilities in Oregon, but both were exclusively for men.

[10] *See, e.g.,* ORS 430.315 (statement of legislative policy finding "alcoholism or drug dependence is an illness").

[11] At the termination hearing, Brayley testified that the program

"kind of makes you take a hard look at yourself and examine yourself and why you made the decisions that you made and what's involved with, you know, making the correct decisions in the future in dealing with—dealing with your

attempts to assist their reentry into the community by maintaining contact and by "connecting" them with a church so that they will have a support system.

Teen Challenge's program does not include systematized psychological evaluation or therapy specifically directed to personality disorders. Nor does Teen Challenge provide training specifically addressing addiction and relapse issues or engage in regular and systematic assessment of program participants' substance abuse status, including administration of urinalyses. Instead, the program relies on close oversight and self-reporting.

Teen Challenge's success in resolving substance abuse is uncertain on this record. The executive director of all Teen Challenge programs in the South Bay/East Bay area testified, more or less anecdotally, that a follow-up survey of participants who had completed a Teen Challenge program in Wyoming showed that, based on the participants' self-reporting, roughly 25 percent relapsed within six months and that very few failed thereafter, yielding an overall success rate of 70-75 percent. There was no testimony as to what percentage of possible respondents actually responded to the Wyoming survey or as to whether that survey distinguished between participants with substance abuse issues alone or those (like mother) who also had personality disorders.

When mother first entered the Teen Challenge program, and for several months thereafter, she was somewhat disruptive, defensive, and consistently critical of the program, the administration, and her fellow residents. That conduct continued after she was reunited with Brayley in September 1996, when they moved to the Asbury Family Center, where mother continued her full-time participation in the program, and Brayley attended group sessions and church services while working for a construction company. Slowly, however, mother's behavior changed. She gradually became more open and receptive, communicative and cooperative, rather than confrontational. Over the same time, mother's child-care skills, demonstrated in caring for the children of

---

past and being—you know—coming to terms with your past instead of kind of dodging them like I've been doing."

other residents, improved significantly, as she showed increasing sensitivity in responding to the children's needs.

Mother's progress in addressing interpersonal and behavioral issues was not unmixed. Moreover, she continued to have occasional, but less frequent, conflicts with Brayley, with staff, and with other residents. The most serious of those incidents occurred in mid-January 1997, when mother and Brayley had an argument which, although it did not involve physical violence, required the intervention of the program director. Mother told the director that she "couldn't handle" her relationship with Brayley any longer. However, after some mediation by the director, the situation improved and did not reoccur. Mother viewed that incident as ultimately a positive experience, demonstrating that she and Brayley, with help, could work through problems without resorting to former patterns of abuse.

On January 22, 1997, in anticipation of the March termination hearing and at SOSCF's request, Dr. Robert Basham, a clinical psychologist, conducted an evaluation of mother. Basham noted that mother's "manner," in contrast to her demeanor during the August 1995 assessment by Dr. Ewell, was "cheerful and optimistic" and that mother "proved fully cooperative and easy to work with." "She expressed herself well * * * and showed no signs of confusion, disorientation, or disturbed thought processes." Basham observed that mother's history and demeanor were "quite consistent with the previous diagnosis * * * of borderline and histrionic personality trait." He continued:

> "Signs of borderline personality tendencies appear to have declined over the past year, and at this time the predominant personality style is histrionic. By themselves, histrionic personality traits do not constitute a serious threat to parental functioning, but it is likely to interfere with her achieving a complete resolution of her other psychological problems.

> "Currently, [mother] is involved in a very supportive atmosphere, and she has not lived in the community for about eight months. It does appear that she has made genuine progress in treatment, but it remains uncertain whether she will be able to maintain the same level of functioning when again attempting to live in the community at large.

Her treatment program reports seeing significant change but indicates that she was initially difficult and resistant to the program. Treatment records from the program suggest the presence of mental health professionals familiar with some of [mother's] complex psychological problems.

"At this point in time, the greatest concern and threat to [mother's] functioning as a parent is whether she will be able to maintain her recent gains. She has shown some fairly rapid changes in her personality, but this leaves the question of whether these are going to last and whether they will survive her transition out of her treatment program. She is probably quite dependent on the current treatment program for her recovery, but sooner or later will need to be able to maintain her recovery on her own."

Basham's report concluded with the following recommendation:

"[Mother's] psychological problems at this time are less severe than was true a year ago, and, if she is able to maintain her gains, she appears capable of functioning as a parent. If she completes a full year of active recovery (which will be true as of May of this year), this could be taken as a sign that her prognosis is improving and that she has some realistic chance of maintaining an ongoing recovery. Because of the length of time that [mother's] daughter has been placed in care and the need to make a decision as soon as possible, I would recommend that [mother] be required to transistion from her treatment program by the one-year mark and demonstrate her ability to live in the community at large prior to any attempt to place her daughter with her. She and her husband would need to have a home study, and there would also need to be some means of monitoring her ongoing progress in recovery after transitioning to community living."

Between the end of June 1996, when mother left Oregon to enter the Teen Challenge program, and the termination hearing in March 1997, child continued to live in foster care with Hovey. During that time, mother visited child four times and, beginning in October, telephoned child regularly. Although mother and child were mutually affectionate during the personal visits, any parent-child attachment was, at best, tenuous. At the time of the termination hearing, child was, apparently, a happy, healthy two-year-old.

The termination hearing occurred on March 4-6, 1997. At that time, mother had maintained sobriety for ten months and was still voluntarily enrolled in the Teen Challenge program. Witnesses, including SOSCF personnel, acknowledged that mother's appearance and demeanor had significantly improved.

SOSCF presented, *inter alia*, the testimony of Drs. Ewell and Basham. Ewell, who had not seen mother since August 1995, reiterated his opinion that continued sobriety was merely a prerequisite to effectively addressing mother's personality disorders and that, even with long-term and focused therapy, those disorders would be difficult to treat.

Basham elaborated on the recommendation in his report:

> "In my assessment there is a substantial risk of eventual relapse. Largely because there are existing—or insufficiently treated mental health problems that will eventually contribute to the relapse return of drug and alcohol use.
>
> "* * * * *
>
> "I again would recommend there would be a six-month period to observe how she does with the transition into the community. There is no guarantee it would be safe, but it would rather give us an opportunity to see if the apparent changes that have occurred over the last several months will continue once she is back living in the community again.
>
> "* * * * *
>
> "Based on my familiarity with her and the additional psychological problems she has and the research that says dual diagnosis clients do have a higher relapse rate, I would say in my opinion the odds are greater than 50 percent—greater than not that she will not be successful even to the six-month time frame.
>
> "* * * * *
>
> "My recommendation is to not [place the child with mother] until there is a greater certainty that she will be able to successfully make the transition from the program to the community and can function in a stable manner independently.

And I am proposing a time period of six months after leaving the program to assess that.

"People are in a fragile state when they leave treatment and there needs to be a significant period. I am giving a somewhat arbitrary time period of six months. In my judgment that would be long enough to give a reasonable estimate about whether they are going to make it or not."

Finally, mother testified. She expressed her determination to complete the Teen Challenge program and her realization that that would be only a beginning:

"I think I've done a lot of [work], but I think I got a long way to go. I don't think anybody that uses drugs for the amount of time that I have is just going to change overnight. I think it's a life-long process."

Mother stated that, upon completion of Teen Challenge, she would actively pursue counseling to further address her personality disorders and would undertake all efforts necessary to make reunification possible.[12] Mother hopes to obtain her GED and, if possible, to work in the substance-abuse counseling field.

The trial court ordered termination, concluding that: (1) mother was unfit, and integration of child into mother's home was improbable in the foreseeable future, ORS 419B.504; and (2) mother had neglected child's basic needs without reasonable cause. ORS 419B.506. The court rendered a thoughtful oral opinion, which emphasized the court's concerns about the effectiveness of the Teen Challenge program, particularly with respect to addressing mother's personality disorders and relapse issues, and about mother's prospects for remaining sober after leaving that highly structured environment.[13] The court also expressed

---

[12] Brayley testified that, because of his employment, and to remain close to Teen Challenge, he and mother intended to remain in the Bay Area. The parties stipulated that if the trial court were to deny termination and order reunification, support services "would be available if the California Interstate Compact people approve[d]" child's placement with mother.

[13] The court stated:

"[I]n terms of the program that she's been in, it's been a closed society with constant supervision. And by everyone's admission, there have been virtually no times or almost no times when she could be left on her own. * * * And what's happened in the course of that is that it has gotten better. She's found it within

severe misgivings about the expertise of Teen Challenge personnel.

In the ensuing judgment, the court found, with respect to the allegations of unfitness:

> "Mother has not had adequate drug and alcohol treatment. The Teen Challenge program does not encourage participation in 12-step meetings, did not refer her to an outside psychologist until shortly prior to this trial. The service providers in the Teen Challenge program do not have the necessary credentials, and the program isn't licensed. None of the staff, except [the Executive Director] have degrees nor does their testimony demonstrate that they have the knowledge and capacity to deal with the serious issues possessed by this mother. * * *

> "This is not to say that the program hasn't done mother some good. It has not, however, been sufficient to ameliorate mother's serious difficulties to the point where she could safely parent her child in the community at large. Mother does well in the structured setting of the Teen Challenge program, but, as Dr. Basham indicated, it would not be safe to return the child until mother has spent several months in the community, and has faced the many temptations which she will encounter. The court does not believe she will face those temptations successfully."

With respect to the allegations of neglect, the court found that mother's contact and visits with child had not been

---

her power to be able to deal with this more effectively more of the time, and that is certainly positive.

"But the long and the short of it is there really hasn't been any alcohol and drug treatment done. In fact, it appears to the Court that the need for things like 12-step programs and continued reinforcement to have her continue to be able to deal with her chemical dependency, is if not outright denied, it's certainly not very encouraged by the program. In fact, may be discouraged by the program.

"This seems like an awfully poor sign for a good prognosis. There also has not been really any one-to-one counseling or professional psychological counseling that's been done to reinforce that.

"* * * * *

"And I come out at the point that I don't see the things in that program that give me any confidence that a person is going to get to the point they need to get to, to realistically on their own deal with substance abuse and other personality difficulties that a person has to come to grips within the long term when not in a protected environment that they are in from the Teen Challenge situation."

"meaningful" and that mother had failed to implement a plan designed to lead to child's reintegration into mother's home.

On appeal, mother challenges both bases of termination. Although the case is close—and, as the trial judge remarked, "difficult"—we conclude that termination was erroneous.

■       We first address the "unfitness" ground. ORS 419B.504. To prevail on that ground, SOSCF must prove, by clear and convincing evidence, that the parent "presently is unable to meet the physical and emotional needs of [child] *and* that the present inability is unlikely to change in the foreseeable future." *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991) (emphasis in original). In determining whether those conjunctive requirements are met, the court is to consider five nonexclusive factors:

"(1)    Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2)    Conduct toward any child of an abusive, cruel or sexual nature.

"(3)    Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4)    Physical neglect of the child.

"(5)    Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504.

■       We have no doubt that, if that standard were applied by reference to the circumstances at the time that the termination petition was filed in May 1996, termination would be fully warranted. As of that time, the combination of mother's continued heavy substance abuse and her personality disorders so impaired mother's ability to parent and her ability—

and even willingness—to effect a lasting adjustment in her life that child's reintegration was "improbable in the foreseeable future due to conduct or conditions not likely to change."

However, by the time of the termination hearing, in March 1997, circumstances were very different. By that time mother had, on her own initiative, entered and successfully completed The Crossroads program, which SOSCF had identified as the optimum initial placement for her. Mother had complied with The Crossroads' continuing treatment recommendation—participating in further intensive residential treatment—by entering the Teen Challenge program and by voluntarily adhering to that program's strictures without relapsing. Mother could have chosen to leave Teen Challenge and return to her former lifestyle; she could have relapsed. She did neither. Instead, she chose to pursue a course of discipline, stability, and sobriety that was unprecedented in her life.

Those are remarkable changes. The critical issue, as the trial court fully appreciated, is whether those changes are transitory—that is, whether, once out of the structure and oversight of Teen Challenge, mother will have the capacity to deal with her problems, or whether her personality disorders, whose manifestations have been largely suppressed in the institutional setting, will reassert themselves, triggering relapse into addiction.

On that critical issue, we, on *de novo* review, and the trial court disagree. Our disagreement is *not* that we affirmatively believe that mother will succeed in maintaining her sobriety after leaving Teen Challenge and that reunification is likely within the foreseeable future. Rather, we depart from the trial court in that we do not believe that this record shows, by clear and convincing evidence, that mother will *not* succeed, thus rendering reunification "improbable." On this record, either outcome is a very real possibility. Thus, SOSCF has failed to meet its statutory burden.

Our conclusion rests substantially, though not exclusively, on the testimony and recommendations of Dr. Basham. In his report, Basham, while concurring in Ewell's earlier diagnosis of histrionic and borderline personality traits,

noted that the former, by itself, "[does] not constitute a serious threat to parental functioning" and that the latter appeared to have "declined" since Ewell's assessment as to have become secondary. Basham stated that, if mother completed a year of sobriety (in May 1997), that "could be taken as a sign that her prognosis is improving and that she has some realistic chance of maintaining an ongoing recovery." Basham emphasized, however, that his greatest concern was whether mother's gains would "survive her transition out of her treatment program." Accordingly, he recommended child not be placed with mother until she had completed residential care and had "demonstrated her ability to live in the community at large."

At trial, Basham reiterated and elaborated on that "wait-and-see" recommendation. He noted that empirical studies show a high rate of relapse among chemical dependency treatment programs and, thus, "there is a substantial risk of just a base rate risk of relapse within the first year of treatment." Given that research and studies that indicate that "dual diagnoses" patients have a higher relapse rate, he concluded that "the odds are greater than 50 percent * * * that [mother] will not be successful" within six months of reentering the community at large. Basham thus recommended "a six-month period to observe how [mother] does with the transition into the community."

Basham did not recommend immediate termination. Rather, he recognized that mother had made substantial changes in her life; that, if her sobriety was maintained for an additional three months, to May 1997, that would evince a "realistic chance" of long-term recovery; and that, because of the risks attending mother's reentry into the community, SOSCF should defer placing child with mother for six months after mother left Teen Challenge. Thus, Basham recommended an approach that would defer a termination or placement decision for a two-year-old child for a maximum of nine months. In the totality of the circumstances, that "wait-and-see" approach was reasonable and sensible.

That approach was also consonant with our holdings in analogous contexts, where we have granted parents "second chances" by reversing termination orders because the

parents had begun to make progress and were "entitled to a chance to show that it is permanent." *State ex rel Juv. Dept. v. Wyatt*, 34 Or App 793, 798, 579 P2d 889, *rev den* 283 Or 503 (1978). *See State ex rel CSD v. Rollins*, 136 Or App 7, 900 P2d 1072 (1995), *rem'd for recons* 322 Or 599, 910 P2d 1107, *on recons* 140 Or App 222, 225, 914 P2d 1094 (1996) (termination was unwarranted where, at time of termination proceeding, mother "had entered the Department of Correction's Summit 'boot camp' program and was reported to be fully cooperating and making a serious effort to eliminate her drug dependency"); *Pennington*, 104 Or App at 199 (reversing termination where mother's attitude and conduct changed "from denial to recognition that she need[ed] help to provide proper care for her children").[14]

We thus conclude that, given the circumstances that existed at the time of the termination hearing, SOSCF failed to prove that child's reunification into mother's home was "improbable in the foreseeable future due to conduct or conditions not likely to change." Mother had made, and was continuing to make, substantial efforts to effect lasting changes in her life. Whether those efforts would prove successful was uncertain, and that uncertainty would be largely resolved within a relatively short time. In those circumstances, the trial court erred in terminating immediately.

The trial court also determined that termination was warranted, because of neglect, under ORS 419B.506. That statute provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

---

[14] *Accord State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 51 n 9, 923 P2d 1259, *rev den* 324 Or 395 (1996) (rejecting assertion that mother's alleged progress in "internalizing" what she had learned about sexual abuse precluded termination, where there was no evidence that "mother has applied, in any way, the information that she has learned to her own life").

"(1)   Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(2)   Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(3)   Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions."

The parties' submissions on the neglect issue are, frankly, unhelpful. Mother makes a couple of conclusory assertions, and SOSCF's brief does not even refer to ORS 419B.506, much less attempt to defend the trial court's alternative disposition. Whatever the reasons for that reticence, we conclude that the record does not support a determination of neglect.

ORS 419B.506 specifies that the pertinent time period for assessing neglect is "six months prior to the filing of [the] petition"—in this case, from November 1995 to May 1996. At trial, SOSCF withdrew its allegations based on ORS 419B.506(1) and proceeded solely on subsections (2) and (3). The trial court concluded that those criteria were satisfied because "the visits mother had with the child [were] not meaningful" and because mother had failed to cooperate in, and implement, a plan designed to lead child's reintegration into mother's home. The trial court's oral ruling shows that its finding of neglect flowed from mother's decision to leave Oregon in July 1996 to enter the Teen Challenge program:

"There has been some visitation along the way between the mother and the child. Just because of the very nature of the situation physically it was required to be telephone contact. And in this particular case, largely because of the child's age, it seems to the Court that that was not a very meaningful situation for visitation.

"* * * * *

"The tragedy in a case like this is that * * * [y]ou do need to deal with your own problems first, because you can't deal with the child's problems unless you deal with your own problems.

"But the manner in which that was done, of leaving the state, going to a program that from this Court's point of view does not really do what is necessary in a case like this, and separating oneself from the child, is not really a very good plan design to lead to integration of the child into the mother's home."

■■ Given the express focus of the statute on events occuring six months before the filing of the petition, the trial court erred in basing its determination of neglect on events occurring after the filing of the petition in May 1996. Nor does the record support a finding of neglect before that time. In particular, although mother sometimes missed visitations, she attended scheduled visitations with child ten times between January 4 and May 9, 1996. SOSCF failed to prove the requisites of termination under ORS 419B.506.

We note, finally, that our disposition does not mean that child must be placed immediately with mother. *See Rollins*, 136 Or App at 14. The "wait-and-see" period Dr. Basham recommended has now largely come and gone. SOSCF retains jurisdiction over the child and, depending on intervening events, may take appropriate action. *Id*.

Reversed.