81 P.3d 99 (2003)
191 Or. App. 78
In the Matter of Amanda Broadway, a minor child.
STATE ex rel DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
Tiffany HINDS, aka Tiffany Rae Hinds, aka Tiffany Rae Broadway, Appellant.
In the Matter of Jessica Ann Houston, a minor child.
State ex rel Department of Human Services, Respondent,
v.
Tiffany Hinds, aka Tiffany Rae Hinds, aka Tiffany Rae Broadway, Appellant.
J000777 and J000778; Petition Nos. 102201BRO2 and 102201HOU1; A119862 (Control) and A119863.
Court of Appeals of Oregon.
Argued and Submitted June 19, 2003.
Decided November 26, 2003.
*100 Phillip T. Wiseman, Salem, argued the cause and filed the brief for appellant.
Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before EDMONDS, Presiding Judge, and DEITS, Chief Judge,[*] and SCHUMAN, Judge.
SCHUMAN, J.
After a three-day trial, the court terminated mother's parental rights to her two daughters. Mother appeals. We review de novo, ORS 419A.200(6), and reverse.
The historical facts are not in dispute. At the time of trial, mother was 25 and her two daughters, A and J, were seven and two respectively. Mother first came to the attention of the Department of Human Services (DHS)[1] in 1999, when she was referred to intensive outpatient drug treatment, but A and J were not removed from her custody until September 2000, when police found a marijuana pipe and methamphetamine residue in mother's apartment after a consent search. At the time, J was an infant and A was five. The next two-year period, ending with the termination trial in September 2002, can be divided into two one-year segments. During the first year, by all accounts (including her own), mother was an unfit parent. She sporadically attended six inpatient and outpatient drug rehabilitation programs, never successfully completing any of them. She was discharged for bad attendance, for letting other residents use her prescription drugs, for starting forbidden relationships with other residents, for noncooperation, and for relapse. She failed several urinalysis tests. During this same one-year period, she and DHS entered into several "letters of expectation" and "service agreements" outlining steps mother had to take in order to regain custody of A and J. She failed to achieve any of them.
The second year began with a service agreement dated August 30, 2001, signed by mother and her DHS caseworker, stating, in part:
"Compliance with this agreement will result in the reunification of [mother] and her children, [A and J]. Failure to comply with this agreement could result in [A and J] remaining in care, returning to care, or DHS implementing the concurrent plan for the children, which is adoption."
Under the agreement, mother agreed to
"1) Successfully complete the drug and alcohol treatment plan * * * with New Step.
"2) Comply with the visitation guidelines which consist of being at the DHS office an hour before * * * scheduled visit and calling 24 hours before the visit to cancel.
"3) Maintain contact with * * * DHS caseworker and notify that worker of any changes in * * * address or phone number.
"4) After consistently participating in drug and alcohol treatment through New Step, Christy will refer me to Options Counseling for parenting [classes]. I will successfully complete parenting [classes] through Options Counseling.
"5) Engage in mental health counseling through New Step/West Salem Clinic."
Mother began the treatment plans, visitations, parenting classes, and necessary reports, but DHS almost immediately decided to begin the termination process. Regardless, and without further assistance from the state, mother continued with the necessary steps. At the time of trial, mother had not taken drugs or alcohol for 380 days and had successfully completed her drug and alcohol treatment program; she continued to attend Alcoholics Anonymous and Narcotics Anonymous meetings regularly. She had successfully completed a 12-week parenting course; she had complied with the visitation guidelines; she had engaged in mental health counseling to the satisfaction of her therapist, with whom she continued treatment; *101 and she had kept DHS authorities informed of her address and phone number. She had been steadily employed at a minimum wage job at McDonald's for eight months and was living with her parents in Independence, saving for her own apartment. She had, in other words, substantially met all the requirements of the service agreement.
Nonetheless, after hearing testimony from a variety of social workers, psychologists, police officers, and from mother and her father, the trial court found that mother was unfit, that her conditions and conduct were unlikely to change within a reasonable time, and that (contrary to the conclusion and recommendation of J and A's attorney) it was in the children's best interest to terminate mother's parental rights. In a letter opinion incorporated into the judgment, the court particularly emphasized the following concerns: first, mother's mental health and sobriety were too tenuous to rely on; second, she had deficient parenting skills; third, she lived at home with her own mother and her stepfather, a convicted sex offender who raped mother when she was a child; fourth, she had no concrete plan to establish an independent living arrangement or to obtain adequate childcare; and fifth, she remained friends with a former lover who was a convicted criminal. In sum, the trial court agreed with the state that mother had "done too little, too late."
The court terminated mother's parental rights under the authority of ORS 419B.504, which provides:
"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.
"* * * * *
"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"* * * * *
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."[2]
In applying this statute, we are guided by the recent opinion in State ex rel SOSCF v. Stillman, 333 Or. 135, 145-46, 36 P.3d 490 (2001), where the Supreme Court set out the following analytical approach:
"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Secondand only if the parent has met the foregoing criteriathe court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the *102 child will become integrated into the parental home `within a reasonable time.'"
Further, if the court determines that the parent is unfit, that the unfitness causes serious detriment, and that integration into the parent's home is improbable within a reasonable time, the court must also determine that termination is in the child's best interest. Id.; State ex rel SOSCF v. Hammons, 170 Or.App. 287, 297, 12 P.3d 983 (2000), rev. den., 331 Or. 583, 19 P.3d 356 (2001). Finally, the court must conclude that the state has proved the facts underlying termination by clear and convincing evidence. Evidence of a fact is "clear and convincing" if it makes the existence of the fact "highly probable." State ex rel Juv. Dept. v. Johnson, 165 Or.App. 147, 156, 997 P.2d 231 (2000). Put another way, evidence is clear and convincing if it "is of extraordinary persuasiveness." State v. Simon, 180 Or.App. 255, 263, 42 P.3d 374 (2002).
Under these standards, the state has not made its case.
As instructed by Stillman, we begin with mother's fitness. ORS 419B.504 provides a "nonexclusive list of six examples of conduct and conditions that courts must consider, both in determining whether a parent is unfit and in determining whether the parent's disqualifying circumstances are not likely to change." Stillman, 333 Or. at 146, 36 P.3d 490. Although neither the state nor the trial court ties particular concerns to particular subsections of ORS 419B.504, those concerns can conveniently be organized in that fashion. We begin with subsection (1), mother's mental health.
The most recent psychological diagnosis offered by the state was from an evaluation performed by a nurse in November 2000 for the purposes of adjusting mother's medication. Her "provisional diagnosis" was post-traumatic stress disorder, panic disorder, both situational as opposed to chronic, and dysthymia (mild depression). The nurse emphasized that the diagnosis was provisional because mother was still in early recovery. Further, the state made no attempt to establish that this mental condition or any other had a negative effect on mother's ability to be a good parent at the time of trial. By contrast, mother's own therapist, who had been treating her regularly for a year at the time of trial, testified that, although mother had what he diagnosed as an adjustment disorder, she had made significant progress and her symptoms were situational. He testified that mother's mental health posed no impediment whatsoever to her reunification with her children. The evidence that mother's mental or emotional health rendered her unfit, therefore, is far from clear and convincing.
Regarding mother's use of controlled substances, no evidence indicates a problem at or within a year of the time of trial. Mother's self-report of 380 days' abstinence as of the date of trial was confirmed by a perfect record of almost monthly negative urinalyses as well as by testimony from her therapist. She had successfully completed an intensive drug treatment program and developed a relapse prevention plan, including regular attendance at AA and NA meetings.
The trial court and the state, however, question the permanence of mother's recovery. Their argument is not persuasive. Five professional substance abuse counselors testified, including four on behalf of the state. The counselor who worked with mother during her year of nonuse testified that her prognosis was good. Those who worked with her during the earlier period testified that, although her prognosis during the first year was not good, a person like mother who then achieves a year of nonuse has a good prognosis. The only contrary evidence came from Dr. Sweet, retained by the state as a rebuttal witness. He testified that between 18 months and two years of nonuse are necessary before a favorable prognosis is warranted.[3] Sweet never met mother nor is he a *103 substance abuse specialist. In light of the other experts' opinions, his, standing alone, does not demonstrate by clear and convincing evidence that mother is likely to relapse. As we noted in State ex rel SOSCF v. Armijo, 151 Or.App. 666, 682, 950 P.2d 357 (1997), on a record not nearly as strongly suggestive of recovery as the one in this case:
"[W]e do not believe that this record shows, by clear and convincing evidence, that mother will not succeed, thus rendering reunification `improbable.' On this record, either outcome is a very real possibility. Thus SOSCF has failed to meet its statutory burden."
(Emphasis in original.)
Regarding mother's ability to interact with her children, the state adduced testimony from two witnesses who had conducted observations. Both had minor reservations but on the whole agreed that she acted appropriately and affectionately, and that the children were bonded to her. Neither stated nor suggested that their observations led them to believe that mother was incapable of parenting her children. Mother, furthermore, presented a report from Stovin, an experienced social worker specializing in parent-child interactions. She evaluated mother using a protocol designed for that purpose and produced a 22-page report describing mother's conduct in glowing terms. She testified that mother is "absolutely beyond mentally adequate with both her children" and that mother and her children had a "strong attachment" to each other. Stovin testified:
"[Mother] demonstrates a very high level of parenting. She's very competent. * * * [S]he has the skills, she had good instincts. She is emotionally in tune with her children. She maintains a good control. She's warm, she's nurturing, she's caring, she's inventive, she can create opportunities to get them focused, have their attention span tapped. She's very engaging. She's very attached and her children are very attached to her."
Stovin identified no weaknesses in mother's parenting and rated her nine on a scale of one to ten, with five being minimally adequate.
The state attempted to rebut Stovin's testimony and evaluation method by adducing criticism from its own psychological expert, Sweet. We do not find the rebuttal to be persuasive. We note first that the state itself apparently had faith in Stovin and her techniques; DHS attempted to retain her to perform a parental evaluation on the couple DHS had provisionally chosen to be the adoptive parents of A and J. Stovin declined, having already committed to evaluate mother. Further, Sweet was contacted by the state on the same morning that he testified, and he based his critique solely on his quick review of Stovin's report and a number of old negative evaluations of mother from social workers and counselors. Before the day of his testimony, he had no familiarity with the evaluation method Stovin used, the so-called Marschak Interaction Method (MIM). The substance of Sweet's criticism was that observation of parent-child interaction is generically unreliable as a method of evaluating parental competence and that the unreliability was exacerbated in the present case because Stovin's evaluation was based solely on observation and not on any familiarity with mother. However, neither Sweet nor any other expert testified that mother's parenting skills were inadequate. Thus, even if Sweet's critique of Stovin were convincing and we reemphasize that it was notthe state would still have failed to prove by clear and convincing evidence that mother's parenting was inadequate. See Armijo, 151 Or. App. at 682, 950 P.2d 357 (quoted above).
Mother's living arrangements and her relationship with a convicted criminal generally fall under the concern reflected in ORS 419B.504(5) dealing with mother's circumstances and the extent to which they might preclude the safe return of A and J to mother's home. The trial court wrote:
"Mother currently lives at home with her mother and step-fatherthis is of concern to the court as her step-father was convicted of molesting her when she was a child and I would not view that home, unless step-father was removed, as a safe environment for these children."
We are less troubled by this circumstance than the trial court for three reasons. First, *104 although stepfather did spend 68 months in prison for sexually molesting mother when she was a child, he received intensive treatment while he was incarcerated and thereafter. While part of a highly regarded program in prison, he voluntarily declined to apply for parole because he wanted to complete treatment. Ultimately he was one of only two people ever successfully to finish the program, at which time he was immediately released from custody in lieu of being required to serve out his sentence. After release, he continued a therapy program, in which his family (including mother) participated; when the program ended, he was permitted to rejoin the family and continued outpatient treatment for another two years. There is no indication that he has ever violated any condition of his parole.
Second, mother testified that she has not allowed, and would not allow, stepfather to be alone with A or J. And third, at the time of trial, mother planned to move into her own apartment as soon as she could save enough money for the necessary rent and deposit; she had already put aside $280. We therefore conclude that mother's living arrangements posed a minimal risk of harm at the time of trial, and no evidence contradicted her assertion that, in any event, she planned to adjust those circumstances so as to remove all risk within a reasonable time.
During part of her drug-free year, mother lived with S (or at least spent a good deal of time, including some overnight visits, with him). S has a history of drug abuse; he appears to go into treatment, achieve a "cure," and relapse. He also has a criminal record. The court had serious concerns about mother's ongoing relationship with him. However, she voluntarily stopped staying with him and, according to her testimony, remained a friend but not an intimate friend. According to the state, mother's testimony that she plans to maintain her friendship on those terms is not credible. However, the state does not explain why the assertion is not credible, and, although the trial court found mother's demeanor to be disturbingly defensive and immature, it did not make any credibility findings. That being the case, we once again conclude that the state has not presented clear and convincing evidence that mother's relationship with S prevents safe reunification with A and J.
The state, then, has not carried the burden of demonstrating unfitness. Regarding some of the unfitness factors (mental health, sobriety, parenting skills), the state presented no persuasive evidence of unfitness at the time of trial. Regarding mother's circumstances and conduct, the evidence of "lack of adjustment" is somewhat weightier, but it is not clear and convincing, that is, extraordinarily persuasive. More importantly, the evidence that she will not make the necessary adjustments "within a reasonable time" is extremely weak. We therefore need not discuss whether mother's conduct, circumstances and condition have had a detrimental effect on A and J, nor whether termination is in their best interest. Mother successfully completed all of the requirements that the state set out as conditions for reunification. Like the attorney representing A and J at trial (they are not represented on appeal), we conclude that termination should not now occur.
Reversed.
NOTES
[*] Deits, C.J., vice Kistler, J., resigned.
[1] DHS was formerly known as CSD, SOSCF, and SCF. We use the most recent title throughout.
[2] Subsections (2), (4), and (6) of ORS 419B.504 deal with neglect, cruelty, sexual or other forms of abuse, and criminal conduct. The state does not allege, nor does the evidence support, that these subsections are implicated in this case.
[3] The trial court also cited testimony from "Janice Smalley, an alcohol and drug counselor," to the effect that mother's prognosis was "good" but that she still stood a 75 percent chance of relapsing. We assume that the court referred to the person identified in the transcript as Janet Smalley, who did testify but did not make any statement about mother's chances of relapseat least not audibly. In response to a question about mother's prognosis, Smalley answered, according to the transcript: "Prognosis would be (inaudible)."