Argued and submitted October 14, 1999, reversed and remanded January 26, 2000

In the Matter of Benjamin Dean Johnson,
Valerie Ann Johnson, Alicia Marie Johnson,
Whitney Elizabeth Johnson, Holly Lynn Johnson
and Christy Lee Johnson, Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

Amy JOHNSON
and Kurt Johnson,
*Appellants.*

(9612-83654; CA A105769)

997 P2d 231

Emily S. Cohen argued the cause and filed the brief for appellant Amy Johnson.

Peter Miller argued the cause and filed the brief for appellant Kurt Johnson.

Elizabeth J. Sher filed the brief for Minor Children.

Judy Carol Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Mother, Amy Johnson, and father, Kurt Johnson, appeal the termination of their parental rights to their six children. We review *de novo*, ORS 419A.200(5), and reverse.

We begin with a recitation of the facts as we find them to have occurred. On December 26, 1996, the Office for Services to Children and Families (SCF) received a referral from a hospital after mother and her newborn child tested positive for marijuana and amphetamine. Mother had delivered the child at home one day before but complications resulted in both being taken to the hospital. On December 27, an SCF caseworker came to the parents' house to take mother to a preliminary court hearing regarding the newborn. While there, the caseworker found the condition of the home to be unsafe and unsanitary for the remaining five children because of exposed carpet tacks and other sharp edges in the house, extreme clutter and a filthy kitchen. In addition, the children had head lice, were inadequately clothed for cold weather and suffered from inadequate dental care. The parents explained that the electricity had been out for a few days before because of a wind storm, that they were remodeling and that the clutter was due, in part, to their Christmas celebration and a lack of closet space in their older-style home. The other children were taken into custody by SCF as a result of the caseworker's observation.

At the hearing later that day, the trial court granted SCF temporary custody of all six children. The trial court found probable cause to believe that the children's condition and circumstances were such as to endanger their welfare due to mother and the newborn's positive tests for amphetamines and marijuana and the extreme clutter in the house. The newborn was placed in a medical foster home where she has remained. Mother helped arrange for the other five children, ages one through eight years old, to be placed together in a relative's home, and they have continued to remain together in foster care up to the date of trial in early February 1999.

During 1997, father, to a lesser degree, and mother made some efforts to comply with SCF's requirements for

reunification with their children. On January 7, SCF's drug and alcohol specialist met with both parents and referred them to a drug treatment program, but neither immediately began treatment. On January 24, 1997, SCF filed an amended petition alleging that the children were within the jurisdiction of the trial court based on the parents' dependency on controlled substances that impaired their ability to parent the children, a pattern of verbal domestic disputes between the parents that resulted in the children expressing fear of their parents and exposure of the children to unsafe hazardous living conditions.[1] As of February 7, mother had made only half of the scheduled visits with the newborn, and father had visited only once.

In March 1997, mother admitted the allegations in the petition and began outpatient drug treatment that continued through July 1997. In April, mother agreed with an SCF service plan to follow through with a recommended drug and alcohol treatment program, to complete parenting classes after she became stabilized in treatment, to attend counseling with father after both stabilized in treatment, to attend scheduled visits with children, and to clean the home. In June, father admitted to SCF to having verbal domestic disputes with mother, to having a history of substance abuse for which he had not completed treatment and to exposing the children to unsafe conditions in the home. He agreed to a service plan similar to mother's. In August, the parents' supervised visits with the children began to increase. Also, mother began an inpatient drug treatment program that lasted until January 1998. Both parents agreed with an SCF service plan to obtain psychological evaluations. In September, mother received a comprehensive psychological evaluation from Dr. Basham.

During 1998, the parents' compliance with their service plans gradually increased. In January, father began outpatient drug treatment that included a mental health component, and mother entered a second residential drug

---

[1] In April 1997, SCF again amended its petition to include allegations that the parents "neglected [the children's] dental hygiene, subjecting them to pain and further risk of dental harm."

treatment program. Both successfully completed their programs. Random urinalysis screening showed no relapses into drug usage, and mother continued to attend weekly support meetings after returning home in August.

In addition, both parents separately completed a 20-week parenting class between February and June, attending 19 out of 20 classes and achieving most of the goals established for the program. In April, mother's parenting counselor observed both parents in a visit with the youngest child and also with three of the other children. She testified at trial that, at that point, the results of the parents' attempts to apply parenting techniques that they had learned in the classes were mixed. She also testified that mother displayed affection for the children and attempted to place limits on their behavior by restricting the number of their toys and that father interacted playfully with the children. However, she also testified that although mother appropriately placed one of the children in a "time out," mother had failed to get the child to stay there. Also, father, for a short time, became so focused on completing a puzzle that he did not pay attention to the children and called one child a "jerk" when she accidently stepped on the puzzle.

Father's parenting consultant testified at trial that she had observed the parents interacting with the newborn, then over a year old, once near the beginning and then again towards the end of their parenting programs. In regard to mother, she testified:

> "I observed a lot of positive interaction. There was a lot of positive reinforcement saying, you know, once you did something well, 'good job,' and that kind of thing. She really followed the child's clues and knew * * * what she needed.
>
> "* * * * *
>
> "* * * And she was able at times to tell the father what she thought the child needed."

As to father, she testified that she saw "real change with his ability to interact with [the child] in a more positive way[,]" that he followed the child's cues and that she saw the parents working together during the visit.

Father and mother maintained a regular visitation schedule with the children that required over an hour of travel each way at times because the supervised visits all took place outside of the family home. Between April and July, the parents participated in therapeutic visits every week or every other week with the three oldest children. Dr. Torres-Saenz, a clinical psychologist who was working with the children, observed the visits, and he testified that he never saw the parents do anything inappropriate. In addition, he testified that mother "was pleasant with [the children], making efforts to engage with them, relate to them." Only on one occasion did he have some concerns that father had not set appropriate limits—resulting in the children's behavior escalating—but he testified that the parents did attempt to set limits, although the children frequently tested them.

Also, mother managed to maintain employment for six months during the first half of 1998, while coordinating and keeping her other appointments. She made approximately $600 a month. However, the state garnished $87 every two weeks to help pay for the children's foster care. Father remained self-employed in various capacities, including running an airport taxi service, selling produce, fixing and selling used cars, and doing trucking locally.

In May 1998, SCF filed a petition to terminate the parental rights of father and mother. Trial on the petition was scheduled for late September 1998. However, SCF acknowledged in June that the progress made by the parents—including the attending of the parenting training, the maintaining of regularly scheduled visits, the maintaining of contact with SCF, the success of mother's outpatient treatment, the amelioration of some of the conditions in the home, mother's gainful employment, and the parents' expressed intention to do "whatever it takes to have their children returned to their care"—warranted a reevaluation of its intention to terminate father and mother's parental rights.

In August, an SCF worker visited the parents' home. She testified that they had installed a new heating system, had completed the remodeling and had cleaned the house and the property. Unlike her opinion when she had visited

the house earlier in January 1998, she now felt that the home "was a safe environment." In early September, the district attorney's office, SCF, and the children's attorney all agreed to set the trial over until February 1999. The SCF caseworker testified that SCF had agreed to do so in order "[t]o further assess the services that the parents had engaged in and get a better determination [of] their ability to integrate those services." The parents signed yet another agreement expressing SCF's expectations of them. Those expectations included having psychological evaluations, the continuation of their treatment programs, the maintaining of safe and adequate housing and their participation in couples counseling.

Later in September, the parents went to Dr. Basham for their psychological evaluations. He diagnosed mother as having a polysubstance abuse problem that was in sustained full remission. That diagnosis indicates that mother had been free from drugs and alcohol for at least one year. Further, mother's evaluation included the diagnosis of a mixed personality disorder with narcissistic and paranoid features. He diagnosed father with a cannabis dependence in early full remission, which indicated less than a year of abstinence. In addition, father was diagnosed with an Attention Deficit and Hyperactive Disorder (predominantly inattentive type) and narcissistic personality traits.

At trial, the deputy district attorney asked Basham how a mixed personality disorder with narcissistic and paranoid features affects a person's parental functioning. Basham testified:

"[A] person with this mixture of personality traits could be expected to have limited empathy for the children. By that I mean would be slow to understand the children's point of view and their subjective view of the world; would be slow to appreciate the children's emotions and how the children are responding to what they are doing.

"I would expect a person with these personality traits to have relatively little tolerance for the day-to-day demands and tasks of caring for the children. There is inherent in that a subjugation of one's own needs and wants to those of the children, and although every parent at some point finds that difficult, what I would expect is to have less tolerance

for that than most, and because of that intolerance, a quickness to become irritable or to be neglectful or just to deny the needs that the children have because of the frustration over having to constantly attend to their needs rather than meeting one's own needs.

"I would expect a person with these personality traits to attribute malicious intent to the children's behavior and to take punitive or overly critical attitudes towards the children. As I was explaining earlier about the perceptual distortion present in paranoia, one assumes that others are treating you badly, or if you're a parent, not behaving the way you want because of some fundamental maliciousness or hostility. And so the parent would presume that that's present for the child even though the child's behavior may have nothing to do with the parent at all. So what can be expected is a just overly critical or rejecting or emotionally cold approach to parenting."

Also, Basham testified that father's diagnosis of narcissistic personality traits raises similar concerns with the exception of father not being prone to attribute maliciousness to the children's behavior. When asked on direct examination about his opinion of the parents' likelihood of changing within a reasonable time to allow the six children to be placed in their care, he replied: "[B]ecause of the similarity between the two of them, I think that the prognosis must be similarly poor for both of them[.]" On cross-examination, Basham admitted that he could not recommend any treatment for these personality disorders "as it is for them essentially an untreatable condition." In addition, he explained that, in part, his poor prognosis for mother and father's ability to function as parents rested on his belief that "the most likely prediction of the future is, you know, sooner or later in the future, it will be just the way it was in the past."

In October, the parents began couples counseling again.[2] Their therapist testified that the parents were "quite willing to be there, and, for all intents and purposes, were quite responsive to our service." Father and mother participated in weekly counseling until mother gave birth to their seventh child in early December. That child was born drug

---

[2] Parents had been referred to a counselor earlier in March 1998 but had attended only two out of eight of those scheduled sessions.

free but suffered from a genetic anomaly that presented few immediate medical issues. Although SCF entered into a voluntary agreement with parents to allow the monitoring of their care for that child, neither SCF nor the hospital opposed the parents taking the child home. At the time of trial (eight weeks after the child's birth), no complaints had been made by the child's medical care givers or SCF about the parents' care of the baby or the condition of their home. In fact, the SCF caseworker for the baby testified that the parents had appropriately prepared to care for the child at home and that both parents had participated in caring for the baby's needs, including feedings every three hours and administering medication. In addition, the parents' sixth child began having home visits with them in December, although SCF continued to schedule visits with the older children outside of the home. The SCF worker who supervised the visits with the sixth child testified that the parents were attentive and affectionate and that they interacted continuously with the child and the new baby during the visits. She testified that father had been diligently persistent and patient in developing a trusting relationship with the sixth child and that the child definitely enjoyed being with him.

In January 1999 and shortly before trial, a temporary SCF assistant observed two visits between the parents and the five oldest children. She testified that the parents brought healthy snacks for the children, gave each child individual attention, assisted the children in various ways during the visit, praised the children and talked with the oldest children about school, pets and friends. She also testified that mother limited her physical interaction with the children and that the parents were not always successful in enforcing "time outs," although they used them appropriately. There is some suggestion that the presence of the newborn and mother's recent Cesarean section could have contributed to mother's lack of physical interaction with the children.

After a week-long trial in the first week of February 1999, the trial court entered judgment, terminating mother and father's parental rights to the six older children under ORS 419B.504 and ORS 419B.506. We will address each ground in turn in light of the evidentiary record. Superimposed upon our *de novo* review of the evidence is the principle

that the state must prove by clear and convincing evidence that the parents are *presently* unfit by reason of conduct or a condition that is seriously detrimental to the children and that the integration of the children into the parents' home is improbable within a reasonable time due to conduct or conditions not likely to change. Otherwise, the termination of father's and mother's parental rights was error. ORS 419B.504;[3] *see also State ex rel SOSCF v. Burke*, 164 Or App 178, 186-87, 990 P2d 922 (1999) (citing *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991), which applied *former* ORS 419.523(3) (1989), later *renumbered as* ORS 419B.504 and *amended by* Or Laws 1997, ch 873, § 7). The standard of "clear and convincing" evidence requires a showing that it is highly probable that father and mother are not *presently* able, or will not be able within a reasonable time, to meet the physical and emotional needs of their children. As we said in *State ex rel Juv. Dept. v. Wyatt*, 34 Or App 793, 797, 579 P2d 889, *rev den* 283 Or 503 (1978),

> "The existence of a prognosis that a person will, at some time in the future, turn out to be a poor parent should not, standing alone, serve as the basis for terminating parental rights. There should be some demonstration of a *present*

[3] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

failure to properly perform the parenting role (as, for example, in the case of a severely mentally retarded parent) or, in the alternative, substantial certainty that the parent *will not be able to* perform that role with minimal adequacy." (Emphasis added.)

There is no dispute that parents had completed extensive substance abuse treatment and sustained a drug-free life style for over a year by the time of trial. There is no evidence that parents' past substance abuse has resulted in irreversible mental or emotional damage that continues to impair their parental ability. It is also undisputed that the parents had made their house into a safe environment by the time of trial. Because ORS 419B.504 requires that we examine the parents' present ability, we give greater weight to the testimony concerning the more recent contacts between the parents and the children. Admittedly, there are differing opinions from the SCF workers on whether father and mother should be reunited with their children. Accordingly, we look beyond the caseworkers' conclusions to the empirical information that supports their opinions.

■  The record pertaining to the parents' interaction with the children during recent visitations is devoid of reports of verbal or physical abuse or even alarming or dangerous behavior on their part. Certainly, some SCF workers point to particular occasions where the parents could have been more consistent in their discipline or could have responded in a more constructive way to inappropriate comments or behavior of the older children. However, the state's burden of proof requires more than proof of imperfect parenting techniques. The evidence consistently demonstrates that the parents showed affection for and interest in their children. They encouraged them and participated in suitable play with them and responded to their physical needs during the course of the visits. In addition, the parents' care of their newborn baby for the eight-week period before trial, including the meeting of the newborn's special medical needs is persuasive evidence of the parents' desire and ability to provide a healthy environment for their children.

The most persuasive evidence in the state's favor is evidence that suggests that, over time, the parents' behavior

will revert back to the life style that existed in December 1996. At trial, one SCF caseworker testified that he did not believe the parents could successfully parent even one or two of the children in the "long term" because he had "no reassurances that when the agency is no longer involved with these people that the circumstances which brought the children into care will not be revisited." Basham's conclusions also support that position. The children's attorney urges in her brief that,

> "notwithstanding the completion of * * * comprehensive services, the parents have nonetheless failed to demonstrate that they have gained any tangible or lasting benefit from these services or that they have integrated the information presented into a change in lifestyle or underlying belief system. At the time of trial, more than two years after the children were removed from their care, the parents were still unable to articulate any problems in their relationship or with their care of the children. The parents consistently underreported and minimized their substandard and unsafe living conditions, their substance abuse, their psychological problems, the neglect to which they subjected the children, and the emotional and behavioral difficulties which were the result.
>
> "Although mother had remained clean and sober for eighteen months and the father for slightly more than a year, both suffer from narcissistic personality traits which portend a poor prognosis for successful parenting; because these mental health problems are persistent and slow to change, effective treatment will take longer than a few months or a year. Moreover, mother's psychological profile is closely mirrored by father's, and they tend to reinforce each other's distorted perceptions. The parents continued, after more than two years of involvement with [ ] SCF, to show a pattern of minimization and denial of their past and present problems as well as the current physical and emotional needs of their children."

■ Under ORS 419B.504(1), one of the factors that the court must consider in determining parental fitness is whether the "[e]motional illness, mental illness or mental deficiency of the parent [is] of such nature and duration as to render the parent *incapable* of providing proper care for the child *for extended periods of time*." (Emphasis added.) To the

extent that personality disorders or traits implicate that factor, the statute requires more than a diagnosis.

■     In this case, Basham testified as to what he would "expect" from a parent with a diagnosis similar to mother's and father's. He did not express an opinion that the parents' diagnoses rendered them medically *incapable* of meeting their children's physical and emotional needs. In fact, their conduct during 1998 belies the predictions by Basham and others that father and mother will not be able to perform their parental roles in the future with minimal adequacy. Basham, the state and the children's attorney assert that the parents have a propensity to be indifferent to the needs of their children and likely are to act in that manner in the future. However, the evidence of parents' substantial progress in their parenting capabilities fails to convince us that they are presently unwilling or incapable of meeting the physical and emotional needs of their children.

In *State ex rel SOSCF v. Armijo*, 151 Or App 666, 679-80, 950 P2d 357 (1997), we considered an argument similar to that made by SCF in this case. There, the trial court expressed concerns about the mother's ongoing capacity to deal with her substance abuse problems and to parent effectively in light of her diagnosis of suffering from borderline and histrionic personality traits. We observed that the mother had made

> "remarkable changes. The critical issue * * * is whether those changes are transitory—that is, whether, once out of the structure and oversight of [her treatment environment], mother will have the capacity to deal with her problems, or whether her personality disorders, whose manifestations have been largely suppressed in the institutional setting, will reassert themselves, triggering relapse into addiction.
>
> "On that critical issue, we, on *de novo* review, and the trial court disagree. Our disagreement is *not* that we affirmatively believe that mother will succeed in maintaining her sobriety * * * and that reunification is likely within the foreseeable future. Rather, we depart from the trial court in that we do not believe that this record shows, by clear and convincing evidence, that mother will *not* succeed, thus rendering reunification 'improbable.' On this record, either

outcome is a very real possibility. Thus, SOSCF has failed to meet its statutory burden." 151 Or App at 682.

Under the circumstance of this case, we arrive at the same conclusion that we did in *Armijo*. We are not persuaded that it is highly probable that reunification will not succeed.

■ The trial court also determined that termination was warranted because of neglect under ORS 419B.506.⁴ Apparently, the sole ground upon which SCF relies under that statute is that the "parents failed to pay a reasonable portion of substitute physical care and maintenance of the six children." The statute requires that we focus on the events that occurred six months before the filing of the state's amended petition in June 1998, inasmuch as that is the petition upon which the judgment was entered. *See Armijo*, 151 Or App at 686. The uncontroverted evidence is that mother's wages were garnished to help pay for foster care during that time. Consequently, she did contribute to their maintenance during that period. Moreover, the parents' contacts with the children as permitted by SCF were sufficient enough to induce SCF in June 1998 to agree that the termination trial should be set over. Without any further evidence on that ground, or any other of the factors enumerated in ORS 419B.506, we are unable to conclude that the state has proven by clear and convincing evidence that "parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of [their children] for six months prior to the filing of a petition."

---

[1] ORS 419B.506 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support and shall consider but is not limited to one or more of the following:

"(1) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(2) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.

"(3) Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions."

■        There is conflicting testimony that the children in foster care are reluctant to return to their parents' care and that, at the time of the removal from the family home, some of them had special needs. The testimony at trial is that a majority of those needs no longer exist, and to the extent that they do and that the reunification process cannot be immediately fulfilled, SCF continues to exercise jurisdiction. Depending on intervening events, SCF may always take appropriate action while furthering the goal of returning the children to their parents.

        Reversed and remanded.