Argued and submitted April 6, affirmed August 1, 2001

In the Matter of Michael Brian Lee Frier-Gentry
and Rosemary Lee Frier,
Minor Children.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Regina Marie FRIER,
*Appellant.*

97-70095A and 97-70095B; A111913

28 P3d 1246

George W. Kelly argued the cause and filed the brief for appellant.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Kistler and Brewer, Judges.

KISTLER, J.

## KISTLER, J.

Mother appeals from a judgment terminating her parental rights to her four-year-old son and her two-year-old daughter. We affirm.

Mother was born in 1970. She was placed in foster care when she was 11. She was returned to her own mother's home but ran away when she was 13 and supported herself, when she was younger, through prostitution. Mother began using alcohol when she was 10, marijuana when she was 11, and methamphetamine when she was 14. She has continued to use methamphetamine and abuse alcohol throughout much of her life.[1]

Mother has given birth to five children. Her first child was born in 1989, when mother was 19. Mother gave birth to a second child when she was 22. She was using cocaine at the time and gave birth to that child in a motel room.[2] Mother's second child was born premature and drug-affected; the State of California removed that child from her care, and a few months later, the child died from respiratory problems. California also took custody of mother's first child, after which mother returned to Oregon. While mother was in Oregon, California terminated her parental rights to her first child.

In 1994, mother was admitted to Oregon Health Sciences University because of suicidal statements. She was "quite delusional and apparently attending to internal stimuli." She admitted using methamphetamine, other street drugs, and alcohol. Mother was transferred to Dammasch State Hospital where she was treated for mental illness and substance abuse. In light of her psychological evaluation and her response to certain medications, the discharge summary

---

[1] Mother also used crack cocaine for approximately seven months and has tried heroin, but her substance abuse has consisted primarily of methamphetamine and alcohol.

[2] Mother testified at the termination hearing for her third and fourth children that she did not know she was pregnant with her second child until that child was born.

from Dammasch notes that "it is quite possible that she's suffering from affective disorder, bipolar manic. It is quite obvious that drugs may have aggravated her manic symptoms." While at Dammasch, mother progressed and was "no longer psychotic and her manic symptoms were well controlled" when she was discharged.

Mother had formed a relationship with one of the patients at Dammasch and was discharged to live with that person's mother in Corvallis. While in Corvallis, mother continued treatment at Benton County Mental Health for about two years and remained on medication for 17 months. The psychiatrist who treated mother in the county mental health program explained that mother's problems were "difficult to diagnose" and that the staff had attempted to "determine whether or not this was an alcohol and drug-induced mental state, or if it was a true mental illness." While mother was being treated for mental health problems, she gave birth on September 12, 1995, to her third child, a son. She later gave birth on June 23, 1997, to her fourth child, a daughter.

On September 1, 1997, police responded to a call regarding the son, who was found wandering unsupervised several blocks from mother's apartment. Daughter, two months old at the time, had been left unsupervised in the home. When the police found mother, she was "impaired, disoriented" and appeared to be under the influence. She was smeared with red food coloring on her face and arms, and her "right nostril was * * * very inflamed and red." Mother later admitted to her caseworker that she had been on methamphetamine, and she pled guilty to one count of child neglect in the second degree. Son and daughter were taken into custody and placed in foster care. Eight days later, mother was arrested for driving under the influence of intoxicants (DUII).

Mother signed a service agreement agreeing to participate in drug and alcohol treatment and to meet with a home health nurse for child development and health care. On November 10, 1997, the children were returned to mother's custody.[3] In May 1998, mother moved to Seaside to be closer

---

[3] The decision was based in part on the inability of the children's foster parents to provide a home for them.

to her mother and sisters. Because she had not completed the substance abuse and parenting programs that SCF required, the Benton County branch of SCF asked the office in Clatsop County to monitor mother and provide services to her. Clatsop County SCF attempted to do so, but mother did not respond to letters or notes left on her door.

On July 17, 1998, an emergency room physician in Seaside reported to SCF that mother had been admitted to the emergency room after falling off her bike and suffering head injuries that rendered her unconscious. In the emergency room, mother could not describe the evening's events, she talked to people who did not exist, and her blood alcohol level was more than double the legal limit for drivers. She told the attending physician that she had left her children in the care of someone she had met three days earlier. The physician explained that the person caring for the children called the hospital and "stated his concern that [mother] had been out using crank, which is methamphetamine." The physician was sufficiently concerned about the well-being of mother and her children that he notified SCF of the incident.

On August 21, 1998, mother was arrested for her second DUII. SCF took the children into custody a second time on September 4, 1998, transported them back to Benton County, and placed them in foster care. Mother moved back to Benton County. Under SCF guidance, she entered drug treatment at Linn County Alcohol and Drug Treatment Program and resumed parent training. At SCF's request, mother completed a comprehensive psychological examination with Dr. David Sweet on December 22, 1998. Sweet diagnosed mother as suffering from substance dependence in early remission, depression, borderline intellectual functioning and borderline personality disorder. When Sweet asked mother what had led to her involvement with SCF, mother replied that "she did not want to incriminate herself" and that "a lot of things in the files * * * are untrue." Sweet's diagnosis noted that the evaluation "may not reveal all of the problems this woman is experiencing" because "[s]he was highly defensive in [the] interview and in testing and might not have revealed information that would be adequate to provide further diagnoses."

During this time, son was referred to the Old Mill Center for counseling because of aggressive and destructive behavior towards himself and others. Son's counselor at Old Mill Center explained that her goal was to decrease his destructive behavior for his "physical and emotional health" and to prevent the "jeopardiz[ation of] another foster placement."[4] Son's behavior included self-mutilation,[5] throwing tantrums, and hitting other children and adults. He is averse to adult touch, preferring "not to be touched and will ask teachers to not rub his back or touch him." After the first month of counseling, son's destructive behavior began to decrease. However, both son's foster mother and his counselor reported that son regressed to aggressive and self-destructive behavior after mother's visits.

Daughter is less troubled than son. However, daughter also exhibited disturbances after visits with mother. Mother is often not aware of daughter's requests—even when asked multiples times—and mother often displays difficulty understanding daughter's needs. For example, mother failed to change daughter's diaper during a three-hour visit, even while knowing that she needed changing and after being asked by the observer to do so.

On April 14, 1999, son's counselor reported that generally "[son's] behaviors have improved significantly" and that "[t]he decrease in [son's] self-destructive and hurtful behavior shows that he is capable of choosing appropriate behavior." Son's foster parents, however, reported continued "regressions following parental visits." Mother agreed to another three-month service agreement on April 21, 1999, which extended her substance abuse treatment and parental training and provided that she participate in sessions with son's therapist to learn his emotional needs. The agreement also increased mother's supervised visits with her children at the SCF offices by one hour and specified that during the

---

[4] Son's behaviors had caused him to be moved from his first foster placement.

[5] According to the counselor, son would slap his head, pinch his face, and scratch his face and arms raw. As she explained, son is "a child that was biting himself raw." Son also engaged in sexualized conduct that was unusual for a child.

week of May 17, the visits would become only partially supervised "if [mother] has continued to be consistent in her parenting and [son] has not had adverse affects after visits as reported by the foster parent and Old Mill Center." Additionally, the agreement contemplated that, when mother found suitable housing, the visits could be relocated to mother's home.

Mother's fifth child, another son, was born on May 13, 1999. Parental visits with her third and fourth children continued and occurred at mother's home. Mother was concerned, however, that she was not allowed more time with her children. Mother began to tape record visits with her children; her "inappropriateness began to escalate"; and her behavior "began to get more extreme." On June 23, 1999, SCF held a family decision meeting regarding reunification. "[T]here was some very vehement objection to the plan of looking at extending visitation with [mother] and her children at her home." The foster mother and the Court Appointed Special Advocate (CASA) for the children felt that each child was regressing after visits and "they [really] felt it was counter productive to even attempt" to extend visits with the goal of reunification. Mother, her caseworker, and her lawyer agreed that mother should have another psychological examination before they proceeded with extended visitation.

Mother visited with the children the week after the family decision meeting. "[Mother] had her teeth clenched together" with her top teeth tucked behind her bottom teeth, explaining that "it keeps [her] from saying bad things." Throughout the visit, she kept her teeth clenched while "making a moaning sound" and talking to the children, although "her words were not comprehensible." When she spoke to the visitation observer, she said: "[S]ometimes you steer me wicked" and "I think it is going to be a rainy summer and winter, I think it's going to get very windy, could be very treacherous, yes I think I could do it." Mother refused to feed the children lunch and told son several times that if he did not sit at the table, she would "tie him to the chair." At the end of the visit, mother decided that the SCF worker's car was too hot for the children, who were already inside ready to go back to their foster parents. The SCF worker started the

car's air conditioner and rolled the windows down, but before the windows were completely down, mother grabbed one window and began "to shake the window extremely hard and screamed * * * 'you can't drive with her in the car next to this window, look at it, it is going to shatter.' "

Less than a month later, mother again became angry with the SCF worker who was supervising the visit and "stated that [the worker] was trying to control her visits and * * * would not let her parent her children. [Mother] stated that she did not want [the worker] doing her visits because of this." Mother was tape recording the visit as well and interviewed son about whether "[mother] had ever hurt him, if he wanted to live with her, and then asked questions about [son's foster father]." After turning the recorder off, mother offered the SCF worker three hundred dollars if she "would let her take the kids home with her 'right now.' "

Two days later, on July 22, 1999, SCF prepared another service agreement for mother, which mother and her attorney "were in agreement about * * *, but they didn't sign." The agreement provided that visitations would be moved back to SCF and "supervised at the SCF Office in Albany until [mother] can control her outbursts of anger." The agreement also stated:

> "[Mother] will have a psychological evaluation by Dr. David Sweet on August 3, 1999. One of the questions that he will address in his evaluation concerns [daughter] being allowed to have overnight visits. [Daughter's] behavior has regressed in the last few weeks. She has reverted to wetting when she had already been potty trained. She has begun to gorge her food.

> "* * * If [Dr. Sweet's] recommendation is favorable to [daughter] having overnight visits, then SCF would initiate a plan of overnight visits. If his recommendation is unfavorable, SCF would look at the alternate plan which is termination of parental rights."

Mother's caseworker wrote Sweet before the evaluation explaining these concerns as well as concerns about son. He stated:

> "* * * I was given feedback that [mother] has made progress. Other feedback from community partners such as

Old Mill School (where [son] attends) and the CASA are that [mother] has made little or no progress and if anything, has regressed. * * * [T]he foster parent, has observed a lot of regression. [Son] has become very aggressive. [Daughter] has reverted to wetting and gorging food.

"The current plan is to reunite [mother] with her children. This is difficult to do when I am getting so much information from other partners that dictate against that goal.

"* * * * *

"I would like to see if [mother] has made any progress since her last review.

"I would also like to get a picture of [mother's] capability to provide ongoing, consistent, care of her children.

"I would like to see if this evaluation can shed some light on [mother's] mental condition. [Mother's] drug/alcohol therapist * * * feels that [mother] does not have a specific diagnosis that anyone could treat. I feel she has a dual diagnosis [and] I feel she does need or could benefit [from] mental health treatment."

Visits continued according to the new service agreement. During a July 27 visit, son played with mother's tape recorder and removed the tape while she was out of the room. When she returned, she "raised her voice," asking her son repeatedly, " '[W]ho else touched it * * *?' " "[Son] appeared nervous and began to scratch at his arm."[6] On the next visit, after mother put son in a disciplinary "time out," "[son] began to scratch his arms and neck * * * severe enough that * * * 90 minutes later, there were still red welts on his arms." During a later visit, when son refused to comply with mother's wishes, mother "physically pulled him and told him he was in time out. He began to kick his feet and [mother] held him on her lap as he cried loudly. He began to pinch himself on his chest and stomach. * * * She told him he didn't have to pinch himself, but then said that she wanted him to feel the pain of his pinches so he would stop."

Sweet examined mother a second time on August 4, 1999. During his examination, Sweet noted advances in that

---

[6] During that visit, mother advised the SCF worker to take "a bunch of speed" to help her cold.

mother followed through with alcohol and drug treatment and was apparently successful in avoiding using controlled substances. During the period from October 20, 1998, to November 4, 1999, mother passed 49 urinalysis (UA) tests.[7] Even so, Sweet felt that SCF had probably gone as far as possible in helping mother succeed independently as a parent for son and daughter. In his report, Sweet stated:

> "If you are going to continue working with her to reunify her with the children, you should expect to have numerous services available to her that will guide her on a step-by-step basis as her children continue to develop. This may not be a practical plan. * * * [T]his may be the time to seek another alternative for [the children]."

At the hearing, Sweet added:

> "[O]ne of the concerns I had, too, * * * [was] how much support does this woman need just to try to maintain on her own, and how viable is that really. Can you really expect ongoing forever massive support services to essentially take care of [mother's] children while they're in her custody[?]"

Visits with the children continued. On October 5, 1999, mother repeatedly told son that he "is bad," and that he has "the devil in [him]." Mother said that he was removed because he "was bad and kicked the walls" and that if he misbehaved like this once he returned home the police might show up at the door and take him away again. On October, 14, 1999, son's current counselor reported to SCF that after his visits with mother, "[son] is experiencing a significant degree of emotional distress as a result of the negative interactions, and that continued visitations may consequently be causing irreparable harm to [son's] emotional and mental health. * * * Clinical observations and consultation with school staff/counselor, SCF, and foster parents, all indicate increased anxiety, irritability, and further regressive, and self-destructive (scratching face raw) behaviors of son" following visits with his mother. The CASA reported that

---

[7] For the most part, the UAs were not random, and mother "generally had advance notice." Mother's own expert agreed that she could have used methamphetamine sporadically throughout this period. She would not, however, as her expert put it, have "been able to be doing * * * three week speed runs during that time and not get caught in the net."

"[daughter] is also very affected after visits. She is clingy to her foster mother and has numerous potty training accidents directly before, during, and after visits. * * * [S]he was nearly potty trained and now has regressed to wearing pull-ups much of the time. She cries a lot, stuffs her mouth full of food at meals and hits and kicks [son]."

On November 5, 1999, the trial court suspended visitations between mother and son. Based on Sweet's evaluation of mother's fitness and increasing concerns about the effect that reunification would have on son and daughter, SCF determined that termination was in the best interest of the children. On November 22, 1999, SCF filed a petition seeking to terminate mother's parental rights because of parental unfitness.

At the request of her attorney, mother completed a psychological examination with Dr. Richard Hulteng on January 18, 2000. Hulteng noticed evidence of psychosis and after inquiry mother reluctantly admitted to having psychotic symptoms. Hulteng diagnosed mother with a psychotic disorder, not otherwise specified, as well as a provisional diagnosis of personality disorder. To control her psychosis, mother began taking psychotropic drugs on March 20, 2000, and Hulteng examined mother a second time on April 19, 2000. Based on his second examination, Hulteng reported that mother had improved markedly. Her IQ score improved by 15 points, putting her in the low average intellectual range, rather than Sweet's earlier placement of mother in the borderline range.

Hulteng concluded that in light of mother's "marked response to recent efforts to treat her mental illness, some diagnostic issues have been clarified, although others have not." He noted that she has a psychotic disorder, which can be treated, and that mother's mental abilities were greater than had previously been understood. He warned, however, that "[g]ains obtained from receiving psychotropic medications will be wiped out if she resumes any pattern of substance abuse." He also explained that "[w]hat remains less than clear is the extent to which [mother's] pattern of unstable, erratic, and irresponsible behavior reflects underlying character problems, as opposed to the debilitating effects of a

major mental illness." He concluded that "[t]hese issues should become elucidated over time as [mother] receives appropriate medication monitoring and adjustment, and continued substance-abuse treatment services, with close observation and monitoring."

Dr. Jolie Krechman, the psychologist whom mother called at the hearing, did not take the position that mother was currently fit to serve as a parent for son or daughter. Rather, she explained in her report that, "[i]f [daughter] is to be returned to her mother's care, * * * it is important that [mother] continue to take her medications faithfully, particularly given her long history of mental illness and poor medication compliance. She should demonstrate a period of stability with no relapse of her mental illness for at least one year, to ensure that [daughter] (and the other children) are safe in her care."[8] Similarly, at trial, Krechman testified, "[I]t would probably be safe to say that if [mother] were able to remain stable for a period of no less than one year, that you might consider reunification."

After mother began taking psychotropic medication, she showed improvement. Mother's counselor testified that mother "is doing great" and "made a lot of progress." Other evidence pointed in the opposite direction, however. Between February 17 and March 23, 2000, mother missed four consecutive weekly counseling appointments. Mother kept her counseling appointment on March 23, 2000, but did not attend any other regularly scheduled appointment between then and the termination hearing on May 15, 2000.[9] During that time, mother also "no-showed" for two appointments with her medication prescriber. Even mother's counselor, who testified that mother had made a lot of progress, acknowledged that mother was not seeing her "as often as would really * * * be beneficial" and that she was "concerned about [mother's] consistency."

---

[8] Krechman's report is limited to daughter and does not address son. Krechman did not have contact with him, nor is she "aware of [son's] emotional needs and special needs."

[9] The counselor testified that she saw mother once when she "dropped in" on April 12, but the counselor did not explain whether she and mother engaged in any counseling at that time.

On April 3, 2000, mother canceled her scheduled weekly visit with daughter, explaining that she needed to watch an elderly neighbor. Later that night, the police were called to the Albany Shop 'N Kart to investigate "a report of a suspicious person" who was "acting strange." Mother had had "a conversation with another person about the age of her child, and there was some confusion, like [mother] didn't know the age of her child." Police found mother loading groceries into her car, with her fifth child secured in a car-seat. During their conversation, mother "was very animated" and "spoke real fast." Police described her as "[i]ntoxicated" and suspected that she was "under the influence of a drug similar to methamphetamine or cocaine."

The officer explained the basis for his suspicion:

"I checked her pulse rate. * * * She had a beats per minute of 120[,] * * * which is incredibly high[.] * * * [A]t one time I asked her to tip her head back and close her eyes, and that was so I could take [a] look into her nostrils to see if they were inflamed from snorting controlled substances, and they were. * * * [T]he skin appeared to be real angry and red. * * * [H]er pupils were real, real dilated, even when I shined my light in them. There wasn't much reaction from her eyes. They continued to stay dilated, which is real indicative of a central nervous system stimulant. And then she would grind her teeth, which is called bruxism, which is indicative of a stimulant as well."

Given mother's condition, the officer called a taxi for her because she was "absolutely not" "in any condition to be driving," and because "if she had dr[i]ve[n] a car we would [have] arrest[ed] her for driving under the influence of drugs."

When the police asked mother about drug use, mother said "she hadn't used anything that day[,]" but that "she had used methamphetamine three days ago" because "a man in her life was causing her problems."[10] Ten days later, on April 13, 2000, mother telephoned her caseworker, who

---

[10] At trial, mother testified that she told the officer only that she had forgotten to take her medication and that she feared she might end up using methamphetamine, not that she had used it three days earlier. The trial court did not credit mother's testimony, and neither do we. Mother offered no evidence why the failure to take her medication would cause her heart to beat 120 times a minute, her nostrils to be inflamed, or her pupils to be dilated.

testified that mother's demeanor and presentation were "similar to some of the old conversations [with mother that were] tangential."[11] The next evening, mother called the CASA for son and daughter and said that "she had some relapse issues, and * * * needed a good five years of treatment for the drug and alcohol problem she has before she feels that she could adequately parent her children."

The trial court found that mother was presently unfit and that the "critical question is whether, after considering all of the circumstances, including [mother's] history, the length of time that the children have been in foster care, the children's need for permanency, the risks posed to the children by continuing the uncertainty in their lives, the Court should give [mother] additional time." The court found that the children could not be reintegrated into mother's home within a reasonable time. It reasoned: "Even the most optimistic estimates of [mother's] potential for successful reintegration of [son and daughter] into her home is 1-5 years. It is highly probable that reunification would be unsuccessful." The court accordingly terminated mother's parental rights to her third and fourth children.

■ ORS 419B.504[12] requires a finding on two distinct, but related queries: whether a parent is presently unfit by reason of conduct or condition that is seriously detrimental to

---

[11] During the conversation mother "offered to go undercover for SCF to assist us in finding children who have been abused. [In a]nother part of the conversation, she talked about not having children unless SCF would like her to * * * [and said] that she was awake when she gave birth to [son], a C-section, and had to tell the doctor how to get [son] out of the womb."

[12] The statute provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

the child; and if unfitness is found, whether that conduct or condition makes it improbable that the child can be integrated into the parent's home within a reasonable time. *State ex rel SOSCF v. Stillman*, 167 Or App 446, 456, 1 P3d 500, *rev allowed* 331 Or 283 (2000); *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000); *State ex rel SOSCF v. Burke*, 164 Or App 178, 186-87, 990 P2d 922 (1999). In determining whether integration can occur within a reasonable time period, the proper focus is on the "child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21); *see Stillman*, 167 Or App at 456. If the parent is presently unfit and reintegration is not probable within a reasonable time, the final question is whether termination is in the "best interests of the child." ORS 419B.500; *Stillman*, 167 Or App at 456.[13]

We agree with the trial court that mother is not presently fit. Mother's own expert witness testified that "if [mother] were able to remain stable for a period of no less than one year, * * * you might consider reunification." The crucial question, as the trial court recognized, is whether, given mother's present unfitness, the children can be reintegrated into the home within a reasonable time. Mother advances primarily two arguments to show that they can. She argues initially that Hulteng's diagnosis and her new treatment regime hold out the promise that she can remake her life. The difficulty with mother's first argument is that the promise implicit in Hulteng's diagnosis is conditioned on mother's avoiding methamphetamine use and consistently taking her psychotropic medication. Mother began her new treatment less than two months before trial began. Even

---

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

[13] We review the facts *de novo* but give "considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990) (internal quotations omitted).

within that time, however, she has been unable to maintain the conditions necessary for her new treatment to succeed.

Moreover, Hulteng explained that mother's amenability to treatment remains uncertain because her behavior may be due to "underlying character problems, as opposed to the debilitating effects of a major mental illness." According to his diagnosis, that issue will be "elucidated" only after mother's psychosis resolves. Hulteng thus could offer no definitive opinion on the degree to which mother's "pattern of unstable, erratic, and irresponsible behavior" is solely the result of her psychosis or whether it reflects more intransigent "character" or personality disorders. Given mother's inability to comply with the conditions of her treatment, the prospect that she will regain stability and that other potential problems can be "elucidated" within a reasonable time is remote. In making that determination, we note that son, especially, and daughter, to a lesser extent, are children with special needs. Their immediate need for certainty and stability in parenting is greater than that of most children. We agree with the trial court that, whatever promise mother's new treatment holds out for her, it is too late to meet those two children's needs within a reasonable time, and that is the proper focus under the statute. *See* ORS 419A.004(21); *Stillman,* 167 Or App at 456.

Mother also argues that her present ability to care for her fifth child is persuasive evidence of her ability to care for her third and fourth children; at the least, she reasons, it is compelling evidence that they can be reintegrated into her home within a reasonable time.[14] Mother observes that at the time of the hearing, SCF had made no effort to remove the fifth child from the home and, in fact, was providing services to assist her in caring for that child. We note that the incident on April 3, 2000, in which mother exposed her youngest child to a risk of injury, calls into question whether she is in fact providing satisfactory care for him. But even if she were, the question whether she could also meet son and daughter's special needs presents a different issue. Not only do those children have greater needs, but, as one of the witnesses

---

[11] We note that, before the trial court, mother did not argue that her ability to care for her last child meant that she could care for the other two.

explained, mother relates better to babies because it is an easier age level for her to manage. When the child becomes older, more independent, and more oppositional, mother has much greater difficulty coping with the child's behaviors and providing care. The difficulty would increase if mother were faced with caring for all three children simultaneously. Sweet agreed with that determination when he testified that:

> "I thought it would be better to focus on trying to keep [the fifth child], the infant, at home with her, and find some other alternatives for the other children, because [mother] didn't seem to be making enough progress, * * * to be able to forge forward * * * for these other children. * * * [I]t was time to move on for the children, while [mother] continued to work and hopefully made enough progress that she could at least keep one child with her."

*Cf. Johnson*, 165 Or App at 157.[15]

■    Finally, we turn to whether termination of parental rights is in the best interests of son and daughter. If son and daughter cannot be reunited with mother within a reasonable time, and we find that they cannot, it is clearly in their best interests to be placed in a permanent, stable home. *See State ex rel Juv. Dept. v. Geist*, 310 Or 176, 187, 796 P2d 1193 (1990). That is particularly true for son, who is emotionally more fragile than daughter and whose self-destructive behaviors are exacerbated by contact with his mother. We agree with the trial court that mother's parental rights to her third and fourth children should be terminated.

        Affirmed.

---

[15] In *Johnson*, we noted that the parents' ability to care for their newborn's special medical needs was evidence that they could also provide adequate care for their other children. *See* 165 Or App at 157. Here, the evidence shows that the children who have been removed from mother's care present far more difficult problems for her than her fifth child. Additionally, mother still faces mental health and substance abuse issues that the parents in *Johnson* did not.